Good morning. My name is John Bjorkman and I'm representing the appellant, Highland Bank, in this matter and we're here this morning asking this court to reverse the grant of summary judgment in favor of BancInsure. There are three areas I'd like to focus my comments on this morning. The first issue, kind of at the heart of this dispute, is this appeal is the competing interests, competing policy language between the grant of coverage for forgeries and the exclusion of coverage. Let me just start with the preamble. Are there any fact errors in the trial court's opinion, in your view? Yes, Your Honor. I believe the court erred on it as a factual matter in concluding that the guarantee at issue was worthless. Did your client have the ability to enforce that guarantee? Not directly, Your Honor. The lead bank, as would be customary, had a right to enforce that. We had rights against the lead bank. It wasn't a lead bank. They purchased the assets. Well, First Premier arranged the financing for this transaction. First Premier then participated out the lease schedules to the... First Premier bought the assets and then they used lenders to help them finance that. Correct. So that doesn't make them a lead bank. That makes them somebody who bought an asset and needs financing to pay for it. That's certainly true, but I think whether you call them... I'm using the term lead bank in the sense that my client viewed this and reported this to the regulators as a participation in which they were participating in a financial transaction with First Premier who was acting, I'll use the phrase, as a lead, as the lead... Does it matter how your client characterizes something? I believe it does, Your Honor. I believe it's... how it's characterized, how it's treated on the books goes to the issue that Bank Insurance had raised. Is this even a guarantee to begin with? I mean, we don't have... this was a... and it goes to the issue of does my client need to have a legally enforceable right against the guarantee? The definition of the guarantee in policy says that my client does not have to have a direct right against the guarantee if it's made out to somebody, to a financial institution from which we have a participation in. They weren't a financial institution. At least they weren't playing that role. I don't know what... they sound like maybe a hedge fund or something, but... Well, Your Honor, and that's part of the problem here. The policy uses the term financial institution. It doesn't define what a financial institution is. As the briefings indicated, you can find all sorts of definitions of what a financial institution is depending on where you look. Highland... or Bank Insurance suggested, well, a financial institution is someone that deals in loans. We'd submit that under the facts here, that's sufficient to constitute a financial institution. And there's testimony in the record from First Premier that they consider themselves dealing in finances, dealing in loans. There's a lease agreement that shows that they're part of the financing arm of this. So I think on the totality of the facts, I think the record supports the conclusion that this was in fact a guarantee, as that term, personal guarantee, as that term is used in the policy. It did not have to be directly, legally made out to Highland Bank in order for the bank to have relied upon that guarantee in its decision to fund the transaction here. Seems like if they were going to rely on it, they might have it assigned to them. That certainly, Your Honor. But I think in terms of reliance, I think that's really a fact issue, and there are multiple issues that go into, was it justified to rely on it? Did the bank properly rely on it? Let me ask you, is there any dispute that your client knew that Malone had a negative four and a half million dollar net worth? Yes, there is. Our expert, and it's included in the record, went through calculations based on tax consequences and concluded that Malone actually had a positive net worth. But that was your expert after the fact. Was there any evidence at the time that they thought that Malone had a positive net worth? Well, again, I believe the record shows that the due diligence that was done by both First Premier and by Highland Bank suggested that this was a credit worthy transaction. I don't understand how your facts could go on and on and on about the due diligence and never reveal the negative presentation made by the investigators before the deal was accepted. Well I think there is certainly evidence in the record that suggests that there were credit problems here, but there is also evidence in the record, testimony from Mr. White, testimony from the representative from First Premier, along with the expert, that suggests there were also indications that this wasn't truly a credit problem. And that's the rub, that's the dilemma of this case, is how does that competing evidence, how does that get weighed? But wait, fraud versus forgery is entirely, I mean fraud isn't covered. Fraud's a credit risk that isn't covered by this bond. Fraud is not covered except where there's a forgery involved, and that's the crucial issue here. By the way, does the record reveal the nature of the forgery? Yes it does. It was Donna Malone's signature on the guarantee. But was it Player signing for Malone on a guarantee she intended to make? The record doesn't reflect that, Your Honor. Is there any evidence in the record that she did not, she was not, had no knowledge of this deal with First Premier and no intention to give a personal guarantee along with her cohort, Mr. Player? Yes, I believe there is an affidavit in the record from Ms. Malone that says she was not aware of the personal guarantee and did not, and it came up in the context of whether she later ratified the guarantee. Well here, in this case, under the terms of an insurance policy that Bank Insure, Bank Insure issued to your client. Correct. Is that correct? And I'm not sure why does the issue of the underlying good sense of making a loan to these people, directly or indirectly, who has standing to assert that in a dispute between your client and the insurance company. It says that if your client makes a bad loan, makes a loan and it's based on a forgery, then their policy covers that loss. Isn't that right? That's correct, Your Honor. It's kind of that simple, isn't it? And that's Pine Bluff. The issue here is now the forged document was procured as a certified copy of an original that Premier obtained from the people they were dealing with. The issue is, did your client have the right to rely upon that or was there terms in the insurance policy that avoided their obligation under those circumstances? There would be nothing in the terms of the policy itself that would address that issue one way or another, other than the definition of guarantee itself, which says in a participation, the guarantee can be made out to someone other than Highland Bank. If a bank makes a loan to a farmer, for instance, and the farm is incorporated, and the farmer wife doesn't know that her husband has given a personal guarantee, how does that differ from Premier's position vis-a-vis the bank here? What am I missing? I don't know that it does differ. There was a guarantee issued. Was the bank entitled to rely on it? I believe they were under the case law. And then where the district court got struggled here was reconciling the evidence on the creditworthiness issue and the evidence on the forgery and deciding, is this a creditworthy case that should fall within the exclusion? What's the relevance of the creditworthiness of the people that were dealing with your bank? Or does the policy say it says that except, you can't have creditworthiness, invalid if there's fraud involved, except if there's a forgery? Correct. And that's Pine Island. So the court could certainly say, or Pine Bluff. Let me tell you my two reactions to Pine Bluff. Number one, the district court expressly said it was basing the decision on an aspect of Arkansas law that the district court in this case said does not apply to Minnesota law. And number two, when the district court in this case says there's a prerequisite for coverage, a requirement that the forgery caused the loss, that requirement is not stated in the bond. That's flat wrong. That ignores the word direct. And directly caused is right squarely there in the lead in on the bond. And I think that drives me toward, and I want you to respond, the proposition that if the forged instrument would not have protected the bank if genuine, then the forgery is not a direct cause of the loss. And on that point, I disagree and I think the court's analysis was incorrect in that you can have more, to be a direct cause, there can be more than one cause. And that would be Pine Bluff, that would be Beach, that would be the Mid-America case. Now, I'm not saying... Beach doesn't help you at all. Well, I think, actually, Your Honor, I think Beach may have the most reasoned, sound, analytical approach of all. Beach is a commercial letter of credit case. I am very familiar. My practice involved a lot of letter of credit cases and they're distinct and unique. And the Beach opinion goes on and on at great length about what's unique about the commercial letter of credit context. So, you know, it doesn't get you here. Well, what I think gets me to here is the focus in this case should not have been on the direct result language of the insuring agreement. That's Pine Bluff. It's the lead-in to the whole insuring clause E, isn't it? It is, Your Honor, and it's a very long clause that includes multiple elements. And I think if the court looks at all of the cases that have been cited in this area, the way to rationalize or harmonize all of these cases is to parse out each of these individual elements. And what we're suggesting is not that the creditworthiness isn't a factor that should be considered. Our argument is it should not have been considered in context with the direct loss. The Minnesota Bankers Association criticizes the trial court's evaluation of the credit and your client's credit practices. Now, that tells me that the bankers of Minnesota want this bond to be credit insurance. No. That's exactly what they're saying. The courts are wrong if they evaluate the credit process. That tells me that your client's friendly association wants what doesn't surprise me. They want credit insurance instead of a banker's blanket bond coverage. Well, I don't believe that to be true, and that's certainly not what my client is attempting to do here. What my client is attempting to do is say the court has to recognize a scenario where there's a forgery and has to harmonize that with a scenario where there's a credit issue. Correct me if I'm wrong, your client says that if the bankers all say after the fact that a guarantee was one of the things we relied on in putting together a complex loan package, and the guarantee, one of multiple guarantees turns out to have a forged signature, doesn't matter how relevant that was to the overall credit evaluation or the ultimate loss, there's coverage. That's your position, right? I see my time up. May I answer? That's my understanding, and correct me if I'm wrong, of your position. No, that is not our position. Well, then where is the line drawn? The middle ground, that would be the position if the court strictly followed Pine Bluff, but the middle ground that takes into account Olaris, that takes into account Bozeman, that takes into account... Okay, just tell me what the middle ground is. The middle ground is that issue becomes a reliance issue, a good faith issue. Under those elements of the insuring clause, my client can say, we relied on this, we wouldn't have issued credit had we not had this guarantee, and the insurer still gets their day to argue, well, wait a minute, that's... Is it a question of law or fact? It's a question of fact in this situation. What case says that? It's a reliance issue, it's a good faith issue, it's the dissent in the... Insuring and construing insurance contracts is an issue of law for the court in almost every state in our circuit. True, but where there's a fact, where the issue is the policy requires reliance, proof of reliance is a fact issue. All a banker has to say is, I relied on that, and you get to the jury every time. Yes, Your Honor. Okay. Might be right, it's a complex question. Mr. Nyland? He's the court counsel, my name's Joe Nyland, I represent Bank Insure. My first question is that neither you nor Mr. Jerkland cited Burrage v. The United States, which was recently decided that when construing the term results from, the courts must analyze this phrase to mean, quote, but for cause. Isn't that a problem for you and your insurance company, a direct cause, but for, there's at least a fact issue, isn't there, as to how you construct that term? I'm not familiar with that case, Judge. I didn't read it. I can tell you that similar cases that talk about, but for, speak of it in terms of causation and fact. We're talking about the bad boys in Washington now with this, but for, how to do this, and that creates some problems for these other cases that we're dealing with, or not? It does not, Judge. The resulting directly from, which is the language in the bond, is different from a direct result. It's different from similar language. For instance . . . Results from, Judge, is different than resulting directly from. For instance, Judge, the Manitowoc case talks about how the different standards are applied. Manitowoc, let me get it here real quick. In that case, Judge, the standard was lost by reason of, and the court said, that's closer to but for, but it also talked about a loss resulting directly from having to be the proximate cause, not a cause in fact. Let me address a couple of the points that you raised with counsel before I got up here. Counsel's parting comments was that there's a middle ground where if it's just reliance, then it's going to be a fact issue for the jury. That essentially ignores the standard. It collapses the resulting directly from element into the reliance element. They're two separate elements. Counsel does not want to deal with the first one. He just wants to deal with the second one. Another issue that you guys asked him about was the guarantee and the bank's reliance on it. Well, we know that down below, the bank argued that they actually did get an assignment of the guarantee and they tried to find some language in the collateral assignment agreement that supported that. They cited it in the briefs to Judge Nelson. They've abandoned that now in front of you. They say, well, we didn't take an assignment in the guarantee. Okay, they have no rights to it. They're arguing though that First Premier is their agent. Well, Judge Nelson determined, I believe incorrectly, that First Premier was their agent for purposes of possession. She never talked about First Premier being an agent for purposes of reliance. Third, if you look at the guarantee itself, and I'll cite it to you, it's at ... In Highland's blue brief, it says, it is undisputed that it would not have made the loan without Malone's guarantee. Do you agree with that? I didn't find any place where you differed with that in the course of the myriad of paper that we have had in this case. Judge, that may be the case. That is the classic but for causation. But for the fact that Joe White got out of bed that morning, they wouldn't have made the loan. But for the fact that these documents were in front of them, they wouldn't have made the loan. That does not ... The loss was not resulting directly from having made the loan. I was going to cite you to the appendix, APP50, which is the Malone guarantee. And specifically, I'd ask you to take a look at paragraph four in there. The bank's argument is that, well, we relied on the guarantee because First Premier was our agent and they would have enforced the guarantee on our behalf. If you look at paragraph four in the guarantee, it says just the opposite. It says that First Premier, if they go after the guarantor, they're entitled to do whatever they want with the funds. They can pay any obligations. They can pay their own obligations. And keep in mind, Judge, that this guarantee is in the context of about 20 transactions involving eight or 10 institutions. So it was up to First Premier to do whatever they wanted with the funds collected from the guarantor. There was no obligation. Also keep in mind that the collateral assignment did not provide any recourse by the bank back against First Premier. Each of those lease schedules was without recourse. So the bank had no rights to go back against First Premier in the first place. One topic, Judge, that the bank ignored in the first brief and responds to in the last two or three pages of its reply brief, is whether there was a loss at all. We know that the bank paid out $3,994,014. You can find that at APP 53, 59, and 65. We know that the bank took in $2,648,833 in lease payments, $48,715 from the ERA bankruptcy. And they sold 65% participation, a true participation, to the Ridgedale Bank for $1.5 million. And they bought this bank and reacquired it, right? They did. And if you look at the tool manufacturing case and the universal mortgage case, no matter how close the parent is to the subsidiary, it doesn't matter for purposes of analysis of the bond. And if it's a subsequently acquired bad debt, it's not resulting directly from. If you take a step back, the bank made a profit of $204,000 on these transactions. They took in $204,000 more than they paid out. In order for there to be a loss under the bond, there has to be a depletion of the bank's assets. There wasn't a depletion of the bank's assets. You can take a look at that American Trust and Savings Bank that discusses what loss and depletion of assets means. It's the cash in, cash out type of analysis. The bank ignores that completely, except for the last couple pages of their reply brief. And they say, well, there's fact issues about that. But they don't cite you to any fact issues. They cite you to no fact issues. They don't dispute these numbers. I assume you argued this to the district court and the district court did not address it. That's correct, Judge. That's in our briefing down below. She didn't reach it. So, if we simply reverse what she did rule, that's still in the case. It is. And you can affirm on that loss basis alone. You'd be, if the bank had taken this guarantee directly from EAR and Mrs. Savings Bank had said it's a forgery, you'd be making this exact same argument, wouldn't you, today? I'd be making the same argument with respect to loss. The argument with result to loss resulting directly from would be more focused on the worthless, fictitious nature of the collateral. I would be leading with the fact that EAR, according to the receiver, was not close to being solvent in 2005. And the first transaction didn't happen until October 2006, almost two years later. And the bank, according to their own credit presentations, showed that Malone was minus $4.5 million in tangible net worth during the first transaction. By the second transaction, her tangible net worth had dropped to a minus $13.1 million. And by the time she hit bankruptcy, she had over $100 million in debt. So what I would be focused on, if they had taken an assignment, was the fact that this was fictitious collateral. And they would eliminate that because this would likely be fraud, but that your policy says fraud does away with our liability unless there is a forgery. And so all of this, I have a relevancy problem with much of this in terms of the language of the policy that you issued. The language of the policy is actually pretty clear if you read it. The distinction judge, and I'm going to cite you to, believe it or not, the state trial court judge, Judge Dickstein. At his opinion, that underlines the Alaris case, is at APPX 195 to 201. The distinction judge, what Judge Dickstein does there is he does an excellent job of analyzing what the application of loss resulting directly from means relative to the forgery. What the bank wants to do is they want to disassociate the two. They want to have reliance only. They don't want to have to show that the loss resulted directly from the forgery. Here, with Malone, it doesn't matter if it was forged or not. It was worthless. That's what that whole string of cases, the majority opinion throughout the country says. That's what five different judges now in Minnesota have said. Judge Dickstein, the unanimous Court of Appeals panel, and now Judge Nelson. All five of them have adopted the majority rule. Judge Dickstein sets out some of the history and puts it in context, so I highly recommend that you guys take a look at that. But now we're faced with results from means but for, and so the issue is but for and that's kind of a fact issue here, isn't it? Well, again, Judge, results from is different from resulting directly from. On your loss, no loss argument, is there something in the policy that limits the loss to the principal, interest, attorneys, fees, all sorts of different things. So why would the forged guarantee in this situation, why would they be made whole if they just recovered the principal? Well, first, loans are not covered. This isn't credit insurance, so loans are not covered at all. Well, I understand that. And so what we're talking about is the loss that resulted directly from the forgery. Right. And in analyzing that, the courts have said a depletion of the bank's assets. That's the AmTrust Savings Bank case. It says the depletion of the assets. It doesn't say you're between the profit that you would have made and the profit that you did made. Isn't anticipated interest income an asset? It's not a loss under the bond, Judge. What makes that clear? Is there a case that makes that clear? That's AmTrust Savings Bank case. It's a 1988 Iowa Supreme Court decision and it directly addresses that. Okay. That's all I have, Judges, unless you have other questions for me. Thank you. Very good. Thank you, Mr. Nyland. Give you a minute to rebut. It's a complicated case, so if there's anything new, I will hear it. Let me just quickly try to better articulate the middle ground here. I mean, we've got a fine bluff on the one hand that if it's but-for, we don't worry about anything else. And we've heard about the Alaris decision and the, you know, creditworthiness decisions. The middle ground, I think, is best evidenced by the dissenting opinion in the Bozeman case, which is the Alaris case. Same facts. What court is Bozeman? Ninth Circuit, Your Honor. And where, what should persuade us that the Supreme Court of Minnesota, if they were hearing this case, would go with Bozeman and not Alaris? Because I think... Other than you're convinced, you know... Well, I think Bozeman, the dissent in Bozeman highlights the dilemma with evaluating cases like this strictly on the results directly from, instead of analyzing cases like this under a reliance on the faith of good faith analysis. But the argument is that NCB, the Supreme Court, has already telegraphed that it would favor the Alaris decision. Is that wrong? I believe that's wrong, Your Honor. Is there any Supreme Court of Minnesota case that you would have us read to be convinced that that court would overrule Alaris, if given the chance? No, there isn't, other than Alaris is an unpublished decision, Your Honor, which doesn't include a full, by definition, full discussion or analysis. The result might have been correct. The failing was in the analysis. What Supreme Court of Minnesota case says we should ignore an unpublished court of appeals? I'm not suggesting you should ignore it, Your Honor. Well, we're an eerie court, you know. I mean, this is serious stuff for us. You can't come in here and talk about the Ninth Circuit, and Mr. Nyland... I mean, you can. Mr. Nyland can talk about the Supreme Court of Iowa. But our job is to figure out whether Alaris is the best evidence of Minnesota law. And I haven't heard anything to the... why it isn't. I don't believe... Other than you don't like it, and your client doesn't like it, and the Minnesota Bankers Association doesn't like it. Well, Alaris would have been more properly decided on the reliance element, and factually in Alaris you could get to that result and say there was no evidence that the guarantee by the sham corporation was valid to begin with and therefore consistent with this worthless collateral line of cases, the result is correct. Where there is evidence going the other way, our contention is Alaris doesn't answer that question, nor did it attempt to. And the dissent in the Bozeman decision illustrates the difficulty and the problem in these type of cases and why it's important to apply all of the factors and analyze the guarantee under the reliance and good faith elements in order to decide is this really a credit risk case or is this a forgery case. That's the middle ground. That allows us to get to the jury so that Hyland's interests are fully considered, along with the bank's interest in not transforming this into credit insurance. Thank you, Your Honors. Thank you, Counsel. Complex case and not a typical issue for us. It's been well briefed and argued. We'll take it under advisement. Court will be in recess for 10 or 15 minutes.